UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------X
RUTH WOODS,                        :
                                   :
                  Plaintiff,       :
                                   :
     -against-                     :
                                   :
SIEGER, ROSS & AGUIRE, LLC, DOE 1, :
DOE 2, and DOE 3,                  :
                                   :
                  Defendants.      :
-----------------------------------X
```

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: 5-18-12 | |

No. 11 Civ. 5698 (JFK)
**Opinion and Order**

APPEARANCES:

> For Plaintiff:
> Jesse Langel, Esq.
> THE LANGEL FIRM

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Plaintiff Ruth Woods' ("Woods" or
"Plaintiff") motion for entry of a default judgment and an award
of statutory and actual damages, punitive damages, and
attorneys' fees and costs.  For the reasons that follow, the
motion for default judgment is granted in part in the amount of
$8,197.00.

## I.    Background

In a complaint dated August 16, 2011, Woods alleges that
Defendant Sieger, Ross & Aguire, LLC ("Sieger Ross" or
"Defendant"), a New York domestic limited liability company with
its principal place of business in Buffalo, New York, is a "debt
collector" as defined by 15 U.S.C. § 1629a(6).  (Compl. ¶¶ 12,
14).  In or around mid-2007, Woods applied online for a $500

payday loan from a company called Eagle Finance.  (Id. ¶ 22).
The payday loan is alleged to be a consumer debt as defined by
15 U.S.C. § 1692a(5).  (Id. ¶¶ 24-25).  She believed that a
repayment amount representing the $500 principal plus interest
would be withdrawn from her Wachovia bank account approximately
two weeks later.  (Id. ¶¶ 23, 28).  However, one week prior to
the repayment date, Woods closed her Wachovia account allegedly
because of unrelated unauthorized charges in the account; Woods
claims that she notified Eagle Finance of the change of account.
(Id. ¶ 28).  The complaint does not allege whether the payday
loan was ever in fact repaid.

On September 25, 27, and 28, 2010, a representative of
Sieger, Ross called and spoke to Woods' aunt, claiming that
Sieger, Ross was a law firm looking for Woods in connection with
an unpaid debt.  (Id. ¶¶ 29-31).  Woods returned the call on the
morning of September 29, 2010.  (Id. ¶ 33).  Woods spoke with a
Sieger, Ross employee who allegedly told Woods that she would
"be sued" and would be "facing jail time" for her unpaid debt;
he pressured her to borrow money or pay the debt using a credit
card.  (Id.).  The Sieger, Ross representative called Woods
three additional times on September 29, 2010 – at 11:22 a.m.,
1:52 p.m., and 1:57 p.m..  (Id. ¶¶ 34-35).  Woods did not answer
the first call.  (Id.).  The second and third calls lasted a
combined total of three minutes and fifty-seven seconds, during

which time the representative told Woods that "a bad check was issued out of [her] checking account," falsely stated that "New York State has tax warrants on [her] right now," threatened to contact the District Attorney, and claimed they would turn her over to tax authorities if the consumer debt was not resolved. (Id.).  Woods requested that Sieger, Ross provide documentation regarding the alleged debt, which was initially refused, but later that day, the Sieger, Ross representative emailed Woods a letter stating that "[p]er your conversation with our office on 9/29/10, it is our understanding that your delinquent claim has not been paid and the total amount due is $1109.00.  This payment will be due in 1 installment of the following:  (1) $1109.00 due by 9/29/10. . . .  Therefore, by paying $1109.00, this debt can be completely resolved and will cancel any possible current or future legal action." (Id., Ex. A).  There is no indication in the complaint that Woods acquiesced to the payment demand, or that anything happened to her after she refused to remit payment.  The week after the purported payment deadline expired, Sieger, Ross representatives called Woods two times and left messages. (Id. ¶ 40).

    As a result of these contacts, Woods claims to have suffered sleep deprivation, stomach pains, anxiety, panic, nervousness, headaches, fear, worry, embarrassment, humiliation, intimidation, indignation, lost concentration, loss of

tranquility, and crying from worrying.  (Id. ¶ 42).  She also claims that she chose not to seek new housing or take a licensing exam, a prerequisite for employment with New York Life Insurance Company, because she feared the results of credit checks that accompanied the exam.  (Id. ¶¶ 43-44).  She brings claims for:  (1) violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692; (2) violation of New York law prohibiting deceptive practices, N.Y. Gen. Bus. Law § 349; (3) intentional infliction of emotional distress; and (4) common law fraud.

Service of the complaint was completed on August 26, 2011 by serving two copies of the complaint and the statutory fee on the Secretary of State of New York in Albany.  See N.Y. Ltd. Liab. Co. Law § 303(a).  (Feb. 27, 2012 Langel Decl., Ex. 2). The Court scheduled an initial case conference for November 4, 2011.  By letter dated September 13, 2011, Sieger, Ross requested a 60-day adjournment to retain counsel; accordingly, the Court extended Sieger, Ross' time to answer or otherwise respond to the complaint and adjourned the initial conference until December 1, 2011.  (Id., Ex. 3).  Only Plaintiff's counsel appeared at the conference, and he informed the Court that the parties had reached a settlement.  The Court entered an order of discontinuance giving the parties 60 days to consummate their settlement.  However, by letter dated January 17, 2012,

4

Plaintiff's counsel notified the Court that the settlement had not come to fruition and requested that the Court reopen the case.  In an order dated January 18, 2012, the Court restored this case to its active docket and scheduled a pre-trial conference for February 16, 2012.  (Id., Ex. 5).  Defendants failed to appear at the conference, at which time the Court gave Plaintiff's counsel leave to bring an order to show cause for a default judgment.  The order to show cause, filed March 5, 2012, notified Defendant that failure to appear on the March 20, 2012 return date would result in an order directing the Clerk of Court to issue a certificate of default pursuant to Local Civil Rule 55.1; however, Sieger, Ross did not appear on March 20, 2012, and the Court granted Woods leave to file a motion for default judgment.  Consequently, by motion dated March 29, 2012, Woods requests that the Court enter a default judgment against Sieger, Ross[1] and determine the damages to which she is entitled.

## II.    Discussion

### A.    Entry of Default

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  In

---

[1] The Doe Defendants were never served, and Woods requests relief only as to Defendant Sieger, Ross.

accordance with Rule 55(a) and Local Civil Rule 55.1,
Plaintiff's counsel submitted a declaration dated February 27,
2012, affirming that:  Defendant Sieger, Ross is a limited
liability company and is not an infant, in the military, or an
incompetent person (Langel Decl. ¶ 13); Defendant Sieger, Ross
has failed to plead or otherwise defend the action (Id.); and
the complaint to which Defendant failed to respond was properly
served pursuant to New York Limited Liability Company Law § 303
(Id. ¶¶ 5, 13; Ex. 2).  Consequently, the Clerk is directed to
enter Defendant Sieger, Ross' default on the record.

### B.    Default Judgment

Plaintiff now applies to the Court pursuant to Rule
55(b)(2) of the Federal Rules of Civil Procedure for entry of a
default judgment in her favor.  In light of Defendant's default,
the Court accepts the factual allegations in the complaint as
true, except those relating to damages, and draws all reasonable
inferences in Plaintiff's favor.  See Finkel v. Romanowicz, 577
F.3d 79, 84 (2d Cir. 2009); Au Bon Pain Corp. v. Artect, Inc.,
653 F.2d 61, 65 (2d Cir. 1981).  However, the "district court
has discretion under Rule 55(b)(2) once a default is determined
to require proof of necessary facts and need not agree that the
alleged facts constitute a valid cause of action."  Au Bon Pain
Corp., 653 F.2d at 65.  Furthermore, the district court does not
automatically accept the allegations of the complaint relating

6

to damages.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty
Corp., 973 F.2d 155, 158 (2d Cir. 1992) (citing Flaks v. Koegel,
504 F.2d 702, 707 (2d Cir. 1974)).  Although an evidentiary
hearing under Rule 55(b)(2) is not required, plaintiff must
establish through affidavits or other evidence "a basis for the
damages specified in the default judgment." Transatlantic
Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105,
111 (2d Cir. 1997).

### 1.   FDCPA Claim

Plaintiff asserts violations of numerous provisions of the
FDCPA, including §§ 1692c(b) (prohibiting communication with
third parties regarding collection of a debt), 1692d, 1692d(1),
1692d(2) (prohibiting harassing and abusive conduct in
connection with collection of a debt), and 1692e, 1692e(1),
1692e(3), 1692e(4), 1692e(5), 1692e(7), 1692e(8), 1692e(10)
(prohibiting false, deceptive, or misleading representations in
connection with collection of a debt).  Based on these
violations, she seeks $1,000 in statutory damages, $5,000 in
actual damages, and $6,197 in attorneys' fees and costs.

The FDCPA is a strict liability statute, and a single
violation is sufficient to establish liability.  See Ellis v.
Solomon & Solomon, P.C., 591 F.3d 130, 133, 135 (2d Cir. 2010);
Clomon v. Jackson, 988 F.2d 1314, 1318 (2d Cir. 1993).
Therefore, taking as true the allegation that Defendant

contacted Plaintiff's aunt three times regarding Plaintiff's debt, and contacted Plaintiff herself at least five times, threatening her with civil and criminal penalties, the Court finds that the complaint adequately establishes Defendant's violation of, at a minimum, FDCPA §§ 1692c(b) and 1692e(4).

### a.   Statutory Damages

The FDCPA provides for a maximum of $1,000 in statutory damages.  15 U.S.C. § 1692k(a)(2)(A).  "All that is required for an award of statutory damages is proof that the statute was violated, although a court must then exercise its discretion to determine how much to award, up to the $1,000 ceiling."  Savino v. Computer Credit Inc., 164 F.3d 81, 86 (2d Cir. 1998).  In calculating an appropriate statutory damages award, the district court considers "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional."  15 U.S.C. § 1692k(b)(1).

Generally, courts have awarded less than the $1,000 statutory maximum damages "where there is no repeated pattern of intentional abuse or where the violation was technical."  Dunn v. Advanced Credit Recovery Inc., No. 11 Civ. 4023, 2012 WL 676350, at *3 (S.D.N.Y. Mar. 1, 2012) (quotation omitted); see, e.g., Cordero v. Collection Co., Inc., No. 10 Civ. 5960, 2012 WL 1118210, at *2 (E.D.N.Y. Apr. 3, 2012) (awarding $250 statutory

damages where defendant sent plaintiff one letter requesting payment of an outstanding medical bill in order to avoid any further legal action); Copper v. Global Check & Credit Servs., LLC, No. 10 Civ. 145S, 2010 WL 5463338, at *2 (W.D.N.Y. Dec. 29, 2010) (awarding $250 statutory damages where defendant called plaintiff's daughter more than once, disclosed plaintiff's debt, and failed to provide proper notice of the debt).  In contrast, Plaintiff here has alleged at least five personal contacts, an additional three phone calls to a third party without consent, a high pressure letter demanding repayment of the entire debt within 24 hours, abusive language, and several threats of legal action.  This conduct is sufficiently severe to warrant the requested $1,000 statutory damages award.  Cf. Dunn, 2012 WL 676350, at *4 (awarding $1,000 statutory damages where defendant left two messages and spoke with a third party about plaintiff's debt, disclosed plaintiff's date of birth and social security number to a third party, and threatened plaintiff with legal action); Robbins v. Viking Recovery Servs. LLC, No. 09 Civ. 1030A, 2010 WL 1840318, at *2 (W.D.N.Y. May 7, 2010) (awarding $1,000 statutory damages where defendant made "frequent telephone calls that harassed plaintiff, that involved third parties without authorization, and that targeted plaintiff's place of employment"); Healy v. Midpoint Resolution Group, LLC, No. 09 Civ. 117S, 2010 WL 890996, at *2-3 (W.D.N.Y. Mar. 10,

2010) (awarding $1,000 statutory damages where defendant called plaintiff at home on more than one occasion, falsely represented that it had commenced lawsuit, spoke with plaintiff's daughter about debt, and attempted to contact plaintiff after being notified to contact counsel).

### b.   Actual Damages

Section 1692k(a)(1) also provides for an award of actual damages sustained by plaintiff as a result of a defendant debt collector's FDCPA violation.  Actual damages are intended to "compensate a plaintiff for out of pocket expenses, personal humiliation, embarrassment, mental anguish, and/or emotional distress that results from defendant's failure to comply with the FDCPA."  Milton v. Rosicki, Rosicki & Assocs., P.C., No. 02 Civ. 3052, 2007 WL 2262893, at *3 (E.D.N.Y. Aug. 3, 2007).  The only evidence submitted in support of actual damages is Plaintiff's own declaration in which she requests an award of $5,000 to compensate for emotional distress, including feelings of fear, anxiety, panic, and nervousness, as well as stomach pains, sleep loss, and headaches she attributes to Defendant's calls.  (Woods Decl. ¶ 18).  Although there is no evidence that Defendant contacted Plaintiff or her aunt after the beginning of October 2010, Plaintiff states that she lived in fear for more than one year; she further claims that worry about her credit history prevented her from moving into a new apartment and from

10

taking a state exam necessary to obtain a job at New York Life
Insurance Company.  (Id. ¶¶ 19, 21-22).  While emotional
distress is to be expected in light of the threats and abusive
conduct Defendant is deemed to have committed, the Court
believes that a $5,000 award is excessive considering that
Defendant's contacts with Plaintiff and her aunt spanned no more
than two weeks and that there is no evidence that Plaintiff
sought or received medical treatment as a result of these
contacts.  Furthermore, the Court has some difficulty accepting
Plaintiff's assertion that she "lived in constant fear that
[her] credit history was or would become harmed" when Plaintiff
acknowledges that "her own internet research" revealed that
Defendant's threats were no more than a "scam," (Woods Decl. ¶¶
19, 23), and when Plaintiff is legally entitled to a free annual
credit report and could have verified her credit history at any
time.  Moreover, there is no evidence that Plaintiff could or
would have obtained new housing or employment but for
Defendant's conduct.  The Court finds that an award of $1,000 in
actual damages will fairly compensate Plaintiff and is
commensurate with the evidence presented in this case and with
awards in similar cases in this Circuit.  Cf. Pearce v. Ethical
Asset Mgmt., Inc., No. 07 Civ. 718S, 2010 WL 932597, at *5
(W.D.N.Y. Mar. 11, 2010) (awarding $750 in emotional distress
damages where Defendant's disclosure of unpaid debt to

plaintiff's daughter caused plaintiff humiliation and fear for daughter's welfare); Krueger v. Ellis, Crosby & Assocs., Inc., No. 05 Civ. 160, 2006 WL 3791402, at *2 (D. Conn. Nov. 9, 2006) (awarding no actual damages for emotional distress where plaintiff's evidence consisted solely of a "generalized, blanket assertion" that "the calls from Defendant caused him 'anxiety, embarrassment, inconvenience, and worry'"); Gervais v. O'Connell, Harris & Assocs., Inc., 297 F. Supp. 2d 435, 440 (D. Conn. 2003) ("The Court is sympathetic with plaintiff's claim and believes that he did, in fact, suffer some emotional distress as a result of defendants' heavy-handed and unlawful conduct.  However, the events in question were brief in time; plaintiff concedes that defendants never expressly threatened him; he acknowledges that he did not need the care of a physician as a result of these events . . . .  Accordingly, the Court awards plaintiff $1,500 for emotional and mental distress damages under FDCPA."); Donahue v. NFS, Inc., 781 F. Supp. 188, 194 (W.D.N.Y. 1991) (awarding $100 in actual damages where "plaintiff suffered some quantum of mental or physical distress stemming in part from" her receipt of three collection notices).

### c.   Attorneys' Fees and Costs

Finally, the FDCPA provides for recovery of reasonable attorneys' fees and costs.  See 15 U.S.C. § 1692k(a)(3). Plaintiff's counsel requests $6,197 in attorneys' fees,

representing 27.13 hours of attorney time at a rate of $200 per
hour, 4.5 hours of paralegal time at a rate of $75 per hour, the
$350 court filing fee, and an $84 service of process fee.

The starting point in determining attorneys' fee awards is
calculation of the "lodestar" by multiplying a reasonable hourly
rate by the number of hours reasonably expended on the
litigation; the lodestar creates a presumptively reasonable fee.
See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of
Albany, 522 F.3d 182, 188–90 (2d Cir. 2008).  The hourly rates
used in determining a fee award should be "what a reasonable,
paying client would be willing to pay."  Id. at 184.  Reference
to market rates "prevailing in the community for similar
services by lawyers of reasonably comparable skill, experience,
and reputation" can assist the court in determining the
reasonable hourly rate to be applied.  Gierlinger v. Gleason,
160 F.3d 858, 882 (2d Cir. 1998).  To determine the amount of
attorney time reasonably spent prosecuting the case, "the court
looks to its own familiarity with the case and . . . its
experience generally as well as to the evidentiary submissions
and arguments of the parties."  Clarke v. Frank, 960 F.2d 1146,
1153 (2d Cir. 1992) (internal quotation omitted).

Plaintiff's counsel Jesse Langel is a 2004 graduate of New
York Law School.  (Langel Decl. ¶ 17).  After working for three
years as a plaintiff's attorney in medical malpractice cases, in

13

late 2009, Mr. Langel founded his own law firm; he currently focuses his practice on representing debtors in debt collection cases. (Id. ¶¶ 19-20). Mr. Langel has been practicing in this area of law for approximately two years, during which time he has represented several clients in New York state and federal courts. (Id. ¶¶ 22-23). Mr. Langel submits that compensation at a rate of $200 per hour is reasonable. "[I]n this district, hourly rates awarded to civil litigators in small firms have frequently ranged from $225 - $375 per hour." Margolies v. Cnty. of Putnam N.Y., No. 09 Civ. 2061, 2011 WL 721698, at *2-3 (S.D.N.Y. Feb. 23, 2011) (awarding attorneys' fees at a rate of $250 per hour to attorney who graduated from law school in 2000 but otherwise "failed to provide information as to his experience, reputation and ability"); see Dunn, 2012 WL 676350, at *6 (awarding attorneys' fees at a rate of $300 per hour to two attorneys in FDCPA case licensed for 15 and 25 years respectively); Sparkman v. Zwicker & Assocs., P.C., No. 04 Civ. 1143, 2006 WL 463939, at *1 (E.D.N.Y. Feb. 27, 2006) (noting that "district courts in this circuit have awarded attorney's fees at rates ranging from $200 to $250 per hour for experienced attorneys in FDCPA cases" and awarding attorney an hourly rate of $200); Kapoor v. Rosenthal, 269 F. Supp. 2d 408, 415 (S.D.N.Y. 2003) (awarding attorneys' fees at a rate of $225 per hour to two attorneys in FDCPA case who practiced since 1993 and

14

1999 respectively).  In light of Mr. Langel's relative youth and inexperience prosecuting FDCPA actions, the Court finds that an hourly rate on the low end of the spectrum in FDCPA cases is appropriate, and therefore concludes that $200 per hour is reasonable compensation for the legal work performed in this case.

Mr. Langel submitted contemporaneous time records indicating that between September 29, 2010 and March 27, 2012, he spent 27.13 hours consulting with his client, drafting the complaint, negotiating the settlement that ultimately fell through, appearing before the Court, conducting legal research, and preparing the default judgment motion papers.  (Langel Decl., Ex. 3).  His paralegal spent 4.5 hours on administrative tasks such as preparing documents for service.  The time spent on what was an uncomplicated and uncontested case is somewhat higher than billings in other FDCPA default judgment cases, but not so high as to be unreasonable.  Cf. Dunn, 2012 WL 676350, at *6 (approving 18.25 hours of attorney time in FDCPA default judgment case).  Therefore, the Court awards attorneys' fees to Plaintiff in the requested amount of $5,763.  Moreover, reimbursement of the $350 court filing fee and $84 service of process fee to the prevailing Plaintiff is appropriate.

## 2.   Additional Claims

Plaintiff asserts additional claims for violation of New
York's deceptive acts and practices statute, N.Y. Gen. Bus. Law
§ 349, intentional infliction of emotional distress, and common
law fraud.  She seeks $1,000 in actual damages for the deceptive
practices claim, and $20,000 in punitive damages for the common
law tort claims.

### a.   New York Deceptive Practices Claim

New York law provides a private right of action for any
person injured by "[d]eceptive acts or practices in the conduct
of any business, trade or commerce or in the furnishing of any
service in this state."  N.Y. Gen. Bus. Law § 349(a), (h).  A
plaintiff with a successful claim may recover actual damages
"not to exceed three times the actual damages up to one thousand
dollars."  Id. § 349(h).  "To state a claim under § 349, a
plaintiff must allege: (1) the act or practice was consumer-
oriented; (2) the act or practice was misleading in a material
respect; and (3) the plaintiff was injured as a result."
Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009).  To
satisfy the consumer-oriented element of a § 349 claim,
plaintiff need not allege that "the defendant committed the
complained-of acts repeatedly — either to the same plaintiff or
to other consumers — but instead must demonstrate that the acts
or practices have a broader impact on consumers at large."

16

Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,
N.A., 647 N.E.2d 741, 744 (N.Y. 1995).

The complaint alleges that "[e]ach deceptive practice and
act alleged is a recurring practice that the defendants have
made, not just to Ruth Woods, but against large numbers of
consumers as part of a policy and practice of extorting money
from unwary consumers.  (Compl. ¶ 54).  Furthermore, Plaintiff
alleges that she believed, as would any reasonable person, that
Defendant "could hurt her using 'tax warrants,' 'dockets,' and
'district attorneys.'"  (Id. ¶ 41).  Although bare, accepting
these allegations as true, Plaintiff has likely established the
first and second elements of a § 349 claim.  However, the New
York state deceptive practices claim is premised on the same
facts as the FDCPA claim and seeks actual damages for the same
"sleep deprivation, stomach pains, anxiety, panic, nervousness,
headaches, fear, worry, embarrassment, humiliation,
intimidation, indignation, lost concentration, loss of
tranquility, and crying from worrying," (Compl. ¶ 42), that
formed the basis of her FDCPA recovery.  Indeed, the complaint
does not allege any independent injury caused by Defendant's
misleading statements, but merely repeats that as a result of
the New York deceptive practices violation, Plaintiff "suffered
actual damages, which include those injuries set forth in
paragraphs 39 through 45 [the FDCPA claim] in this complaint."

17

(Compl. ¶ 56).  The Court has already determined that a $1,000 damages award will fairly and adequately compensate Plaintiff for the entirety of the emotional distress she suffered due to Defendant's abusive conduct.  The fact that Plaintiff presented both state and federal law theories of liability does not entitle her to separate recoveries for a single injury – that is, her emotional distress.  See Shepherd v. Law Offices of Cohen & Slamowitz, LLP, 668 F. Supp. 2d 579, 582 (S.D.N.Y. 2009) ("[P]laintiff will not be able to recover statutory damages under both FDCPA and the GBL [because] that would violate the rule against double recovery for the same injury."); cf. Medina v. District of Columbia, 643 F.3d 323, 328 (D.C. Cir. 2011) ("If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." (internal quotation omitted)).  Thus, even if the complaint adequately states a claim, Plaintiff cannot independently recover actual damages under New York state law.  Therefore, Plaintiff's application for a default judgment in the amount of $1,000 on her § 349 claim is denied.

**b.   Intentional Infliction of Emotional Distress**

To make out a claim of intentional infliction of emotional distress under New York law, plaintiff must demonstrate: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless

disregard of a substantial probability of causing, severe
emotional distress; (3) a causal connection between the conduct
and the injury; and (4) severe emotional distress." Conboy v.
AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001).  The alleged
conduct must be "'so outrageous in character, and so extreme in
degree, as to go beyond all possible bounds of decency, and to
be regarded as atrocious, and utterly intolerable in a civilized
community.'"  Howell v. New York Post Co., Inc., 612 N.E.2d 699,
702 (N.Y. 1993) (quoting Murphy v. Am. Home Prods. Corp., 448
N.E.2d 86, 90 (N.Y. 1983)); see Stuto v. Fleishman, 164 F.3d
820, 827 (2d Cir. 1999) (noting that under New York law "[i]t
has not been enough that the defendant has acted with an intent
which is tortious or even criminal, or that he has intended to
inflict emotional distress, or even that his conduct has been
characterized by 'malice,' or a degree of aggravation which
would entitle the plaintiff to punitive damages for another
tort" (quoting Restatement (Second) of Torts § 46 cmt. d)).  The
requirements for a successful claim are so "rigorous, and
difficult to satisfy" that "of the intentional infliction of
emotional distress claims considered by [the New York Court of
Appeals], every one has failed because the alleged conduct was
not sufficiently outrageous."  Howell, 612 N.E.2d at 702.

     Although the allegations in the complaint are taken as
true, they do not rise to the level of atrocity required to make

out an intentional infliction of emotional distress claim in New
York.  First, "[c]ourts are reluctant to allow recovery under
the banner of intentional infliction of emotional distress
absent a deliberate and malicious campaign of harassment or
intimidation." Cohn-Frankel v. United Synagogue of Conservative
Judaism, 667 N.Y.S.2d 360, 362 (N.Y. App. Div. 1998).  The
complaint alleges that Defendant contacted Plaintiff's aunt
three times, Plaintiff herself contacted Defendant one time, and
Defendant called her five times over a period of approximately
two weeks.  Certainly the frequency and duration of Defendant's
contacts are insufficiently outrageous to be the type of
"campaign" required to establish the claim.  See Conboy v. AT&T
Corp., 84 F. Supp. 2d 492, 497, 507 (S.D.N.Y. 2000), aff'd, 241
F.3d 242 (2d Cir. 2001) (granting motion to dismiss intentional
infliction of emotional distress claim where plaintiffs alleged
that debt collector obtained private information, including
their unlisted telephone number, and proceeded to contact them
between 30 and 50 times in one month).  Moreover, although the
Court in no way condones Defendant's conduct and choice of
language towards Plaintiff, a single reference to contacting the
District Attorney if she did not repay the outstanding consumer
debt, and the bizarre threat to contact tax authorities with
respect to unrelated, allegedly delinquent tax payments cannot
satisfy the exacting standard under New York law.  Indeed, New

20

York courts have rejected intentional infliction of emotional distress claims involving language and conduct even more extreme than Defendant's.  See Am. Credit Card Processing Corp. v. Fairchild, 810 N.Y.S.2d 874, 877, 880 (N.Y. Sup. 2006) (finding debt collector's threats that "The secret service is going to arrest you," "You will lose your house," and "They are going to bury you, John, you lying bastard," to be "rash, rude, callous, unprofessional and improper" but not so outrageous to establish a cause of action for intentional infliction of emotional distress).  Indeed, Plaintiff can cite only one New York case in support of her application for default judgment on this claim, Long v. Beneficial Finance Company of New York, 330 N.Y.S.2d 664 (N.Y. App. Div. 1972).  However, Long merely recognized that intentional infliction of emotional distress may be cognizable in the context of debtor-creditor relationships, but it in no way addresses the type of conduct necessary to succeed on such claim.  The Court finds as a matter of law that Defendant's conduct does not meet the strict standard for an intentional infliction of emotional distress claim.

Additionally, there is a fair amount of caselaw in New York holding that a lack of medical evidence regarding plaintiff's emotional distress is fatal to an intentional infliction of emotional distress claim because plaintiff has failed to offer non-speculative proof establishing the "severe emotional

distress" element of the claim.   See Cusimano v. United Health
Servs. Hosps., Inc., 937 N.Y.S.2d 413, 418 (N.Y. App. Div. 2012)
(affirming grant of summary judgment in favor of defendant where
"plaintiff presented no medical evidence to substantiate her
general claims that she suffered severe emotional distress");
Roche v. Claverack Coop. Ins. Co., 874 N.Y.S.2d 592, 597 (N.Y.
App. Div. 2009) ("Due to plaintiff's failure to present medical
evidence of severe emotional distress, defendants were entitled
to dismissal of plaintiff's speculative cause of action for
intentional infliction of emotional distress."); Walentas v.
Johnes, 683 N.Y.S.2d 56, 58 (N.Y. App. Div. 1999) (holding that
to make out a claim for intentional infliction of emotional
distress "[t]he plaintiff is required to establish that severe
emotional distress was suffered, which must be supported by
medical evidence, not the mere recitation of speculative
claims") (citing Leone v. Leewood Service Station, Inc., 624
N.Y.S.2d 610 (N.Y. App. Div. 1995))); Christenson v. Gutman, 671
N.Y.S.2d 835, 839 (N.Y. App. Div. 1998) (affirming denial of
leave to amend complaint to add intentional infliction of
emotional distress claim, despite the fact that "the alleged
conduct may have exceeded the bounds of decency within a
civilized society," because "plaintiffs' failure to submit
medical evidence or the need to seek medical attention resulted
in conclusory or speculative allegations that were properly

22

dismissed on summary judgment"). Here, there are no allegations that Plaintiff ever sought medical treatment for her emotional distress, nor did Plaintiff submit any medical evidence in support of her application for a default judgment. The Court has found that Plaintiff is entitled to compensation for her general emotional distress – although less than she requested – but that finding does not _ipso_ _facto_ create a valid cause of action for intentional infliction of emotional distress. The Court accepts that Plaintiff suffered "sleep deprivation, stomach pains, anxiety, panic, nervousness, headaches, fear, worry, embarrassment, humiliation, intimidation, indignation, lost concentration, loss of tranquility, and crying from worrying," but her recitation of those symptoms, standing alone, does not establish the severe emotional distress necessary to make out a claim. Thus, Plaintiff's application for a default judgment on her intentional infliction of emotional distress claim is denied.

### c.  Common Law Fraud

To establish a claim for common law fraud under New York law, plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d

Cir. 1997).  "[T]he damages incurred by reason of the fraudulent
conduct must be actual pecuniary losses."  Pope v. Saget, 817
N.Y.S.2d 1, 4 (N.Y. App. Div. 2006).

The Court assumes for the moment that Plaintiff has
adequately established material misrepresentations – that is,
the existence of a debt and the legal consequences of failing to
repay the debt – as well as Defendant's knowledge and scienter
and focuses on the reliance and injury elements of fraud claim.
Plaintiff alleges that she justifiably relied upon Defendant's
misrepresentations by refraining from moving and from taking a
licensing exam.  However, Plaintiff, who was unemployed at the
time, stated that she did not pursue the exam or new housing due
to her fear of a credit check, not her fear that Defendant would
make good on its threat to report her to the District Attorney.
Of course, an unpaid debt would have some affect on her credit,
but there is nothing in the complaint establishing Plaintiff's
prior credit history such that the Court can link Defendant's
misrepresentation regarding a purported $1,109 debt to
Plaintiff's fear of a credit reputation so impugned that she
would not be able to obtain housing or employment.  Furthermore,
the Court has difficulty accepting the reasonableness of
Plaintiff's reliance when she could have obtained a free copy of
her credit report and verified her own credit score at any time.

24

More importantly, however, Plaintiff has failed to allege
any cognizable fraud injury.  There is no indication in the
complaint that Plaintiff ever acquiesced to Defendant's demands
for payment, and therefore, she suffered no out-of-pocket
financial loss as a result of Defendant's misrepresentations.
The only other possible claims of injury the Court can discern
are the lost opportunities for employment with the New York Life
Insurance Company and for new housing.  Those injuries are
speculative, since there are no allegations that Plaintiff
applied for and could or would have obtained the desired job or
apartment but for Defendant's conduct.  In any event, forgone
opportunities are not redressable under a common law fraud
theory.  See Rather v. CBS Corp., 886 N.Y.S.2d 121, 127 (N.Y.
App. Div. 2009) ("Damages are to be calculated to compensate
plaintiffs for what they lost because of the fraud, not to
compensate them for what they might have gained. . . .  Rather's
claim that, but for CBS' fraud, he could have had more
remunerative employment than that which he ultimately obtained
at HDNet is unavailing.  The loss of an alternative contractual
bargain cannot serve as a basis for fraud or misrepresentation
damages because the loss of the bargain was undeterminable and
speculative." (internal quotations and alterations omitted));
see also Pope, 817 N.Y.S.2d at 5 (reversing lower court's denial
of motion to dismiss fraud claim because "the sum total of

damages appears to have been non-pecuniary aggravation and attorneys' fees.  The measure of damages in an action predicated on fraud is the actual pecuniary loss.  Here, . . . plaintiffs suffered no such loss, let alone such loss attributable to defendants"); Stich v. Oakdale Dental Center, P.C., 501 N.Y.S.2d 529, 531 (N.Y. App. Div. 1986) (reversing lower court's denial of motion for summary judgment on fraud claim because "plaintiff has failed to submit any proof of actual pecuniary injury, the sole compensable form of damages in a fraud action").

As Plaintiff has not asserted any underlying causes of action upon which a demand for punitive damages could be grounded, the application for a default judgment in the amount of $20,000 in punitive damages is denied.

### d.    Pre-Judgment Interest

Neither the complaint nor the papers in support of Plaintiff's application for a default judgment demand pre-judgment interest.  However, the proposed one-page default judgment submitted by Plaintiff's counsel includes a line item for pre-judgment interest at 9% from September 25, 2010.  The decision to award pre-judgment interest in a federal question case rests within the sound discretion of the district court, and any award "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the

award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." <u>Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO</u>, 955 F.2d 831, 833-34 (2d Cir. 1992). As Plaintiff suffered no financial loss, will be fully and fairly compensated by the statutory and actual damages awarded herein, and never formally requested that pre-judgment interest be included in any statutory or actual damages calculation, the Court declines to award pre-judgment interest in the default judgment.

### III.      Conclusion

The Clerk of Court is directed to enter the default of Defendant Sieger, Ross & Aguire, LLC in the record. A default judgment is entered against Defendant Sieger, Ross & Aguire, LLC in favor of Plaintiff Ruth Woods in the amount of $8,197.00, representing $1,000 in statutory damages under the FDCPA, $1,000 in actual damages under the FDCPA, and $6,197 in attorneys' fees and costs. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:   New York, New York
         May 18, 2012

_____
              John F. Keenan
         United States District Judge

27